Ernest WELCOME, Petitioner-Appellant,

v.

Leon J. VINCENT, Superintendent,
Greenhaven Correctional Facility,
Respondent-Appellee.

No. 519, Docket 76–2126.

United States Court of Appeals,
Second Circuit.

Argued Dec. 7, 1976.

Decided Feb. 2, 1977.

Julia P. Heit, New York City, for peti-
tioner-appellant.

Joseph W. Henneberry, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen. of the State of N. Y., New York City, of counsel), for respondent-appellee.

Before KAUFMAN, Chief Judge, and FRIENDLY and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This appeal presents the question whether appellant was deprived of his due process right to a fair trial when the trial court refused to permit his counsel to question a defense witness regarding his confession to the same crimes for which appellant and his two codefendants were on trial. We answer the question in the affirmative and reverse the judgment of the United States District Court for the Southern District of New York, Edward Weinfeld, Judge, dismissing appellant's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

*Facts*

On March 10, 1970, appellant was convicted in the New York Supreme Court, Bronx County, on two counts of murder, for which he was sentenced to concurrent terms of 25 years to life imprisonment. The convictions were affirmed without opinion by the Appellate Division. 39 A.D.2d 841, 331 N.Y. S.2d 995 (1972) (mem.). Leave to appeal to the New York Court of Appeals was originally denied by that court's Judge Burke but was later granted by Chief Judge Breitel.

While his application was pending in the Court of Appeals, appellant moved in the Supreme Court, Bronx County, for a new trial and vacatur of his conviction, pursuant to N.Y.Crim.Proc.Law §§ 440.10(1)(g), (h) (McKinney 1971), on the ground that a prosecution witness had recanted his trial testimony and admitted perjuring himself. The motion was denied by the Supreme Court without an evidentiary hearing, and this denial was affirmed without opinion by the Appellate Division, with one justice dissenting, 46 A.D.2d 860, 361 N.Y.S.2d 378 (1974) (mem.). The Court of Appeals, consolidating the direct appeal and the appeal

from the denial of the new trial motion, dismissed the direct appeal, on the ground that Chief Judge Breitel had no authority to grant leave to appeal after it had been denied by Judge Burke, and affirmed the Appellate Division's denial of a new trial. 37 N.Y.2d 811, 375 N.Y.S.2d 573, 338 N.E.2d 328 (1975) (per curiam). Appellant then commenced the federal habeas corpus proceedings that have led to this appeal.

The murders for which appellant and two codefendants were indicted occurred on November 2, 1967, at the office of Katz Brothers Realty in the Bronx. Three armed men entered the office and shortly thereafter shot and killed the two Katz brothers. Prior to appellant's indictment for these crimes, the State indicted one Cunningham, who had confessed participation in the murders. Cunningham later repudiated this confession, claiming it was elicited through police brutality, but New York Supreme Court Justice Murtagh held, after an evidentiary "Huntley" hearing, *see People v. Huntley*, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), that Cunningham's statements to the police "were made freely and voluntarily and were in no wise the product of coercion of any nature whatsoever." Accordingly, Cunningham was tried for the Katz murders, and his statements to the police were admitted against him.

In those statements Cunningham said that on the afternoon of November 2 he and three others, one Green, one Branch and a third fellow that he did not know, went to 308 East 149th Street in the Bronx, the address of the Katz realty office, and that he went up to the first floor landing, remaining in the hallway while the other three went into the office. After several minutes he heard some shots, became excited, ran down the stairs and out onto East 149th Street, then ran to Cortlandt Avenue, and then over to 145th Street and Third Avenue, at which point he hailed a cab and returned to Manhattan.

At Cunningham's trial, Detective Edward Farrell explained the circumstances surrounding this confession and told of other inculpatory statements and actions by Cun-

ningham while in police custody. Farrell testified that, with the assistance of two other detectives, he went to Cunningham's apartment in Manhattan on November 9, 1967, took Cunningham back to the 40th Detective Squad clerical room in the Bronx, explained to him his *Miranda* rights, and heard Cunningham make certain admissions. Farrell testified that the detectives then took Cunningham in an automobile to 145th Street, which Cunningham said was familiar to him, and past the 149th Street bridge, which Cunningham said he and the others had driven across on the day of the shooting, and that Cunningham pointed out where they had parked the car at Morris Avenue, told the detectives, "Hold it," when they got about 75 feet past the Katz Brothers office, and said, "Back up, I believe you passed it, this looks like the place." He said, according to Farrell, "I think I was standing up in the middle of the stairs someplace. I ran in that direction," indicating Cortlandt Avenue. He also said, "This looks like the spot. I almost got hit over there by a car. I was running." Cunningham was subsequently questioned by an assistant district attorney, and then, according to Farrell, he and another detective took Cunningham for a second ride, during which he essentially confirmed his previous story as to what he had done and where he had been. Farrell further testified that Cunningham had said that Branch and Green had small revolvers and that the third fellow had a shotgun in a paper bag and was wearing a hat similar to the hat that was found in the Katz Brothers office as well as glasses, a pair of which had also been found in the office. One of the other detectives corroborated Detective Farrell's testimony.

Despite this incriminating evidence, the charges against Cunningham were dropped in the middle of his trial. Subsequently, at appellant Welcome's trial, the Bronx District Attorney appeared personally and stated that Cunningham was an addict suffering from the symptoms of withdrawal and "would have admitted anything," that he had been given a lie detector test which showed he had nothing to do with the par-

ticular case, and that a police investigation revealed that Branch and Green, the two persons whom Cunningham named as committing the robbery with him, could not have done so since one was out of state and the other was in jail at the time. It was left unexplained how such an unreliable person could have provided so many details (date and time of the robbery, exact location of the Katz office, number of men entering the office) regarding a robbery with which he supposedly had' no connection, in the absence of police prompting, which was not suggested by the Bronx District Attorney or by any party to these proceedings. It was also left unexplained why the District Attorney's office originally had enough faith in Cunningham's confession to indict him, to argue for admission of the confession at the Huntley hearing, and to bring Cunningham twice to trial (the first trial ended in a mistrial).

Appellant Welcome was then brought to trial with two codefendants, Gale and Holmes. Janet Lacorn, a Katz Brothers employee, identified appellant at trial; her identification had first occurred in a lineup some five weeks after the murders. Her testimony was cast in doubt by the fact that she said she had never seen appellant with a gun in his hand, although she had testified at the Cunningham trial that the second man to come into the office (identified as appellant) had a gun. Dolores Marcell, not an eyewitness to the crime, testified that at the time of the murders she had bumped into appellant on the street in front of the building that housed both the office where she worked and the Katz office. She, too, had identified appellant in a lineup, but, when asked in court to point to the man she had bumped into on the street, she first pointed to a codefendant, not Welcome, then claimed that she had been mistaken. Moreover, when shown photographs of appellant prior to the lineup, Mrs. Marcell had not been able to identify him. The testimony of these two key witnesses was contradictory on a crucial point: Mrs. Lacorn was quite positive that on the date of the murder appellant had been wearing a

checkered coat and no hat; Mrs. Marcell was equally positive that appellant had been wearing a dark, solid color coat and a hat.

Other than police officers testifying about their investigation,[1] the only prosecution witness besides the two women was Vincent Turner, an acquaintance of appellant's. Some two weeks after the murders, according to Turner's testimony, appellant mentioned to him in a poolroom that he had "burnt" two men in the Bronx, "them two studs." At the time he testified, Turner, who had four previous convictions, was incarcerated awaiting sentencing on five felony indictments to which he had pleaded guilty a year earlier. Some two and one-half years after appellant's conviction, Turner recanted his trial testimony in a statement to appellant's counsel, a recantation upon which, as noted above, appellant based his unsuccessful new trial motion in the state courts.

Appellant presented an alibi defense at trial. His girlfriend stated that she was with him on the afternoon of the crime at his mother's house. Two friends of his mother testified that they saw him at his mother's house on the afternoon in question; one corroborated the girlfriend's testimony that appellant was washing the walls of the house in preparation for a party planned by his mother.

After appellant presented his alibi witnesses, he called the man previously tried for the crime, Cunningham, who testified, rather remarkably, that on November 2, 1967, he had driven to the Bronx with Branch and Green, that the three of them, with shotguns and pistols, entered the hallway at 308 East 149th Street in the Bronx and robbed the Katz office. The court refused to permit counsel to inquire on direct examination into any statements made by Cunningham to the detectives or the district attorney. On cross-examination by the State, Cunningham denied robbing the

Katz office, stating that he did not at first understand the questions put to him by appellant's attorney, thinking that the attorney was talking about his "confession," a term used for the first time in appellant's trial by Cunningham himself. On redirect, counsel sought to question Cunningham regarding the confession, stating that he wished to use the prior inconsistent statements to impeach the witness's credibility. The court, however, refused to permit such questioning, on the ground that Cunningham, having been called by the defense and not having inculpated any of the defendants, could not be considered a hostile witness. At this point, the Bronx District Attorney appeared at appellant's trial and, as noted above, explained why the charges against Cunningham had been dropped. He conceded that appellant had continually asserted his innocence and had requested a polygraph test, but said that the request had been denied because witnesses had identified appellant and because the test was "unreliable," although apparently not unreliable enough to prevent administration of it to Cunningham prior to the charges against him being dropped.

### Discussion

Appellant presents two independent grounds upon which, he argues, his habeas corpus petition should have been granted. We need not consider the second of these, relating to Turner's recantation, because we find that the first, relating to the refusal of the trial court to permit cross-examination of Cunningham as to his confession, requires reversal. Our question, of course, is not whether the refusal to permit the desired cross-examination was erroneous as an evidentiary matter, but whether it deprived appellant of a fundamentally fair trial in violation of the due process clause of the Fourteenth Amendment. *See Buchalter v. New York*, 319 U.S. 427, 431, 63 S.Ct. 1129, 87 L.Ed. 1492 (1943); *United States ex rel. Sadowy v. Fay*, 284 F.2d 426, 427 (2d Cir.

---

1. The police work in this case was singularly inept: no photographs were taken of the lineups; lineup forms were lost, so that no one knew the date of the Lacorn lineup; Detective Farrell's notebook on the investigation was "misplaced"; and appellant was permitted to leave the police station after Mrs. Lacorn had identified him.

1960) (Swan, J.), *cert. denied,* 365 U.S. 850, 81 S.Ct. 814, 5 L.Ed.2d 814 (1961); *United States ex rel. Corby v. Conboy,* 337 F.Supp. 517, 519 (S.D.N.Y.1971).

In resolving the fair trial issue, our starting point must be the Supreme Court's decision in *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). The defendant in that case, like appellant here, sought to examine at trial another person who had confessed to the crime. In *Chambers,* that other person, one McDonald, had made a sworn, out-of-court confession, which the defendant Chambers introduced into evidence after calling McDonald to the witness stand. Then McDonald, on examination by the State, said that he had previously repudiated his confession. Following this examination, Chambers sought to cross-examine McDonald as an adverse witness, but the trial court refused to permit the desired questioning, on the ground that, since McDonald had not inculpated Chambers, he was not technically adverse. Chambers then sought to introduce the testimony of three persons to whom McDonald had admitted the crime. This testimony was excluded as violative of the hearsay rule. *Id.* at 291–92, 93 S.Ct. 1038. The Supreme Court concluded that the combination of the hearsay exclusion and the restriction on Chambers' examination of McDonald denied Chambers "a trial in accord with traditional and fundamental standards of due process." *Id.* at 302, 93 S.Ct. at 1049. Its holding was limited to "the facts and circumstances of this case." *Id.* at 303, 93 S.Ct. at 1049.

Because of this latter limitation, *Chambers* is not directly controlling here. Its value in the instant case is further diluted by the fact that, by virtue of the hearsay testimony excluded there, the Supreme Court did not have to decide, *see id.* at 298, 93 S.Ct. 1038, as we must, whether a significant restriction on a defendant's examination of a witness who has confessed to the crime is alone enough to deny the defend-

ant a fair trial. The Supreme Court did indicate, however, that such a restriction constituted "error," *id.,* and it further stated that the criminal defendant's right of cross-examination is of vital importance:

> The right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation, and helps assure the "accuracy of the truth-determining process." *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213 (1970); *Bruton v. United States,* 391 U.S. 123, 135–137, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). It is, indeed, "an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas,* 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965).

*Id.* 410 U.S. at 295, 93 S.Ct. at 1046.

The restriction on appellant's questioning in the instant case left the jury with Cunningham's initial admission on direct that he participated in the crime, followed (on questioning by the State) by his denial of involvement and his mention of a "confession" about which the jury was given no further information. Appellant's efforts to bring the confession itself before the jury, either through its introduction or through questioning of Cunningham, were halted by the trial court. Thus the jury did not receive information bearing directly on a key decision that it faced—whether to believe Cunningham's initial admission of guilt, which, if true, would have exonerated appellant. The prejudice to appellant's defense is manifest. The situation here closely resembles that in *Chambers,* where "all that remained from McDonald's own testimony was a single written confession countered by an arguably acceptable renunciation. Chambers' defense was far less persuasive than it might have been had he been given an opportunity to subject McDonald's statements to cross-examination . . . ." *Id.* at 294,[2] 93 S.Ct. at 1045.

---

2. It is true that Cunningham in his direct testimony had admitted his participation in the crime, though he claimed it was a misunderstanding, while in *Chambers* McDonald's con-

fession was before the jury. But in *Chambers* the opportunity to cross-examine McDonald was limited as was the opportunity to examine (with the use of the confession) Cunningham

■ The reason given by the state trial court in appellant's case for restricting questioning of Cunningham was the same as that given by the state courts in *Chambers* : since the witness called by the defendant had not incriminated the defendant, he could not be considered an adverse witness subject to impeachment by the party who called him. *Chambers* unequivocally rejected this line of reasoning as applied in a criminal trial: "The availability of the right to confront and to cross-examine those who give damaging testimony against the accused has never been held to depend on whether the witness was initially put on the stand by the accused or by the State. We reject the notion that a right of such substance in the criminal process may be governed by that technicality . . . ." *Id.* at 297–98, 93 S.Ct. at 1047. *Chambers* makes clear that appellant did not give up his due process right to examine Cunningham thoroughly merely by calling Cunningham to the witness stand.[3]

■ The district judge denied the writ on a ground different from that relied upon by the state trial court for restricting the questioning of Cunningham. In his view,

*Chambers* found a denial of due process because the confession and related hearsay statements there bore "persuasive indications" of reliability and "trustworthiness," whereas in the instant case there were substantial "indicia that [Cunningham's] confession was unreliable." 418 F.Supp. 1088 at 1092 (S.D.N.Y.1976). We have considerable doubt about the relative unreliability of Cunningham's confession.[4] More importantly, we think that *Chambers* does not require that the confession be so reliable as to support a conviction or even to warrant trial of the confessor. The assessment of trustworthiness in *Chambers* appeared only in the context of the Supreme Court's discussion of the hearsay testimony that the defendant there sought to introduce, in which three persons would have testified that they heard McDonald admit commission of the crimes. *See* 410 U.S. at 300–02, 93 S.Ct. 1038. The *Chambers* Court did not consider the issue of trustworthiness at all in relation to the restricted questioning of McDonald.

■ Our holding is narrowly confined to rare situations of this sort, where another person, present on the witness stand, has

here. In each case the defense was prevented from a searching probe on the witness stand of another who had confessed to the very crime for which the defendant was on trial.

3. Although the trial court here made its ruling long before *Chambers* was decided, there is no question that the trial court's decision was erroneous as a matter of federal constitutional law at the time it was made. *Chambers* "establish[ed] no new principles of constitutional law," but rather was decided "in accord with traditional and fundamental standards of due process." 410 U.S. at 302, 93 S.Ct. at 1049. *See also Gates v. Henderson*, No. 76–2065 (2d Cir. Jan. 12, 1977) slip op. 1345, 1349 n. 2 (distinguishing, for retroactivity purposes, between "decisions that clarify or extend" and those that "overrule or sharply change" existing law).

4. Other than the reasons given by the Bronx District Attorney for dropping Cunningham's prosecution (the two alleged coconspirators could not have participated; a polygraph test indicated Cunningham's innocence; Cunningham was a narcotics addict undergoing withdrawal and hence unreliable), reasons that left many questions open, as discussed *supra,* Judge Weinfeld relied on the fact that Cunning-

ham's statement to an assistant district attorney failed to identify the building where the crime occurred, the date of the crime, and the fourth person involved in the crime, and was not against his penal interest, since it did not state Cunningham was present at the shooting or committed a robbery. At 1093. But this statement of Cunningham's was only one of several made to investigating officials, and appellant and his codefendants sought to question Cunningham about all of them. According to the police detectives, Cunningham twice directed them to the scene of the crime, he indicated to them that he knew the date or approximate date on which the crime occurred, and he knew the number of armed men who had entered the Katz office. He identified a hat and a pair of glasses, found at the scene of the crime, as belonging to the unknown fourth robber. Finally, Cunningham's statements were plainly against his penal interest—he admitted helping to plan and to execute an armed robbery that resulted in two deaths. His statements survived a Huntley hearing and established a case prima facie of felony murder against him, as is evidenced by the fact that the State twice brought him to trial for murder.

previously confessed that he, rather than the defendant on trial, has perpetrated the crime. We hold that to restrict examination of such a witness, so that his prior confession may not be proven, is to deny the defendant a fair trial, at least when the confession, though retracted, has some semblance of reliability, a test more than met by Cunningham's statements here, *see* note 4 *supra.* We disavow any attempt to "constitutionalize" the law of evidence pertaining to the use of prior statements of a witness, except to the extent of answering the narrow question left open in part by the nature of the holding in *Chambers.*

Because the restriction on appellant's questioning of Cunningham denied him a fundamentally fair trial, we reverse the judgment of the district court and remand to that court with instructions to issue the writ of habeas corpus unless the People grant Welcome a new trial within a reasonable period to be fixed by the district court.

Reversed and remanded.