Kenneth GROCHULSKI, Appellant,

v.

Robert J. HENDERSON, Superintendent, Auburn Correctional Facility, Appellee.

No. 1164, Docket 79–2245.

United States Court of Appeals, Second Circuit.

Argued May 21, 1980.

Decided Oct. 3, 1980.

Certiorari Denied Feb. 23, 1981. See 101 S.Ct. 1383.

Norman Barclay, Asst. Dist. Atty., New York City (Robert M. Morgenthau, Dist. Atty., New York County, Robert M. Pitler, Asst. Dist. Atty., New York City, of counsel), for appellee.

Vivian Tseng, Student Counsel, Washington, D. C. (Georgetown University Law Center, Appellate Litigation Clinic, Michael E. Geltner, Washington, D. C., of counsel), for appellant.

Before LUMBARD, OAKES and MES-KILL, Circuit Judges.

LUMBARD, Circuit Judge:

Kenneth Grochulski appeals from the dismissal by the District Court for the Southern District, Brieant, J., of his petition for a writ of habeas corpus. On February 10, 1977, Grochulski was convicted in Supreme Court, New York County, Bentley Kassal, J., on two counts of second degree murder, one count of first degree burglary, and one count of second degree weapons possession. Grochulski was subsequently sentenced from 20 years to life imprisonment.

Grochulski's appeal to the Appellate Division resulted in an affirmance, 64 A.D.2d 872, 407 N.Y.S.2d 770 (1st Dept. 1978).[1] Leave to appeal to the Court of Appeals was denied. 45 N.Y.2d 842, 410 N.Y.S.2d 1028 (1978). In his present appeal, he argues that he was deprived of his right to a fair trial because of the trial court's failure to order immunity conferred on two defense witnesses: one Grochulski maintains, would have testified in such a way possibly as to exculpate him; and the other would have testified that another man confessed to the crime for which Grochulski was on trial. We find these arguments to be without merit, and affirm the denial of the writ.

The evidence presented at trial showed that Grochulski took part in the first of two attempted robberies of Robert Kortright, a Manhattan drug dealer. Sharon Quinn, Grochulski's girlfriend, knew Kortright and believed that he kept substantial amounts of money in his apartment. Quinn suggested that Grochulski steal his money, and offered to reconnoiter Kortright's home and to take his gun away from him.

On October 20, 1975, Quinn, along with a friend, Karen Smagalla, visited Kortright and purloined his gun. They went to Jersey City, where Grochulski lived. Grochulski then drove to Manhattan with Smagalla, along the way picking up John Ek and Kenneth Borovina.

Smagalla's inquiries at Robert Kortright's apartment revealed that no significant amount of money was present. The conspirators then decided that the money might have been left with Robert's parents, and resolved to rob their apartment, located a few blocks away at 340 East 11th Street. Finding the door unlocked, Grochulski, Ek and Borovina, all armed, entered, and held six members of the Kortright family at gunpoint. During his attempts to locate the cash he believed to be there, Grochulski struggled with Robert Kortright's father, Angel, and shot him dead at point blank range.

The three men then fled the apartment and drove off with Smagalla in Grochulski's car. On her return to New Jersey, Smagalla told Quinn what had happened, and Quinn later told her story to an acquaintance, Robert Baron. Quinn decided to attempt the robbery a second time, this time with Smagalla, Baron and two additional men, Peter Janulis and Danny Cusick. On October 25, 1975, this group drove to Robert Kortright's apartment in Baron's car. They entered the apartment, struggled with Kortright, wounded him, and fled.

A witness described Baron's car, and the police eventually located all participants in the two crimes. A bystander to the October 20 crime identified the getaway car used in that attempt as Grochulski's. Several members of the Kortright family, all eyewitnesses to Angel's murder, identified Grochulski as the killer in police line-ups. Smagalla was indicted and allowed to plead

---

1. In the course of his state court appeal, Grochulski, either directly or by virtue of adopting arguments made to the Appellate Division by his co-defendants, exhausted his state remedies with regard to all the claims he raises in this appeal. Grochulski adopted his co-defendant's argument that the Grant statement, discussed *infra* pp. 53–56, should have been admitted in evidence, and the trial judge's ruling that it was inadmissible relied in part on Grant's refusal to testify. Grochulski did not urge in the state court appeal that this refusal should have been met with a grant of immunity, as he now argues, but the question of such immunity had been raised at trial, and we view this as an instance of a mere "variation[ ] in the legal theory" which does not mean that appellant has failed to exhaust his state remedies, *Picard v. Connor*, 404 U.S. 270, 277, 92 S.Ct. 509, 513, 30 L.Ed.2d 438 (1971).

guilty to second degree manslaughter with no promises as to sentence, and she testified against Grochulski, Ek, Borovina, Baron, Cusick and Janulis, all of whom were indicted and stood trial.

Appellant's first contention is that he was denied a fair trial because Sharon Quinn was not given immunity by the trial court or prosecutor. Grochulski asserts that her testimony would have exculpated him, though he does not suggest in what manner it would have done so. Quinn was called as a prosecution witness at trial. Because the prosecutor had been informed by her attorney that she would plead the Fifth Amendment in response to questions about the events of October 20 and 25, 1975, she was put on the stand outside the presence of the jury. Quinn was asked if she knew Robert Kortright, and she then took the Fifth, saying that her response to further questions would be the same. At this point, Grochulski's attorney attempted to cross–examine her, asking if she had been in the Criminal Courts building on a day during the trial when Karen Smagalla had also been in the building. Quinn again took the Fifth. Borovina's counsel then asked the court to immunize Quinn with respect to those questions she had been asked.

The trial judge ruled he had no authority under New York law to confer immunity; only the prosecutor could do so. Defense counsel then asked the prosecutor to immunize Quinn. He refused.

As a matter of New York law it is clear that the defense cannot require a prosecutor to grant immunity to a witness. *People v. Sapia*, 41 N.Y.2d 160, 391 N.Y.S. 93, 359 N.E.2d 688 (Ct.App.1976), *cert. denied*, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977). No constitutional right is thus violated. Even when, as in federal prosecutions, a witness can be granted mere "use immunity" in order to surmount his invocation of the Fifth Amendment, we have held that the circumstances under which a prosecutor might be under a duty to confer such immunity on a witness pursuant to defense request are extremely narrow. *United States v. Turkish*, 623 F.2d 769, 771–79 (2d Cir. 1980).

The category of such circumstances cannot be any broader where, as in New York State, only full transactional immunity can be granted, since such expanded immunity means that the prosecutorial interest in avoiding such compelled grants of immunity (an interest given paramount recognition in *Turkish*) will be even greater than in the context in which *Turkish* was decided.

Appellant's reliance on *Government of the Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980) is misplaced, because in *Turkish* we explicitly rejected *Smith's* standards for the grant of defense witness immunity. *Turkish* controls this aspect of Grochulski's appeal. In that opinion we stated that "in most situations where defense witness immunity is likely to be sought, some legitimate opposing prosecution interest will exist, and constitutional fairness is not a satisfactory standard against which to assess such interests." *Turkish, supra*, at 777. "Without precluding the possibility of some circumstances not now anticipated," we continued, "we simply do not find in the Due Process Clause a general requirement that defense witness immunity must be ordered whenever it seems fair to grant it." *Id.* The only circumstance cited by the *Turkish* opinion as one suitable for a grant of immunity was that present on the unusual facts of *Smith* itself, which we described as constituting "simply an instance of a prosecutor interfering, for no apparent reason, to suppress evidence that was about to become available to the accused," when the objecting prosecutor lacked jurisdiction over the witness. *Id.*

Nothing in appellant's arguments convinces us that his claim that Sharon Quinn should have been granted immunity falls within the narrow category left open by *Turkish*. His argument, in essence, is precisely the one we rejected in *Turkish*– that Due Process requires that defense witness immunity be granted when "it seems fair to grant it." *Id.* We said in *Turkish* that "we think trial judges should summarily reject claims for defense witness immunity whenever the witness for whom

immunity is sought is an actual or potential target of prosecution. No hearing should. be held to establish such status." *Id.* at 778. We suggested that the prosecutor submit an affidavit setting forth his suspicions of a witness's criminal activity. In this case, such an affidavit would have been superfluous. Quinn's involvement in the crimes which were the subject of the trial was brought out in testimony, and it was apparent she was a "potential target of prosecution" within the meaning of *Turkish*. Thus the court's refusal to order the prosecutor to give her immunity was correct.[2]

A subsidiary claim made by Grochulski is that the prosecutor intimidated several witnesses, who, Grochulski argues, would otherwise have taken the stand and corroborated his other alibi witness. The trial court held a special hearing to deal with these charges, and concluded that the prosecution had engaged in no misconduct. The district court similarly found no evidence of misconduct. We agree. The prosecutor did visit the homes of various alibi witnesses in order to obtain statements about their forthcoming testimony, but these visits were limited to the minimum necessary, and indeed, occurred only because the defense had notified the prosecution of its intent to put these witnesses on the stand at a time later than that fixed by the New York statute governing adversary notice of alibi witnesses, N.Y.Crim.Proc.Law § 250.-20. The trial court concluded, on the basis of questioning the allegedly intimidated witnesses, that no prosecutorial misconduct had occurred; in light of the trial judge's ability to observe the demeanor of the witnesses, we reject Grochulski's claim to relief on this point.[3]

Grochulski's second major claim on appeal is that he was denied a fair trial because Justice Kassal ruled inadmissible an out of court statement made by Lawrence Grant to Hudson County, New Jersey, prosecutors, in which Grant reported that Robert Baron had confessed to him the crime for which Grochulski was convicted. Grochulski argues that his conviction, following the exclusion of the Grant statement, violated *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). We disagree.

Baron had been called by the prosecution for the limited purpose of exhibiting his appearance to the jury in order to rebut a defense claim that one of the defendants might have been mistaken for Baron. The trial judge ruled that the defense could not ask Baron any questions on cross–examination other than ones concerning his name and physical appearance without Baron becoming a defense witness for purposes of such additional testimony. Nonetheless, the defense did attempt a cross–examination, to which Baron responded by pleading the Fifth Amendment.

Later in the trial, the defense sought to introduce a transcribed statement made in February, 1976, in which Grant told Lee Redd, a Hudson County prosecutor, that he had been at the home of Drew Jeziorski when Baron entered, in possession of a shotgun. Grant told the prosecutor that Baron admitted to having used the gun to rob a Manhattan man and his son, and that the crime had been set up by "Karen Spingolli." Grant's statement also included descriptions of others said to be involved in the crime (which matched the identities of Peter Janulis and Danny Cusick), and a description of events leading up to the fatal shooting.

---

**2.** Additionally, we note that the *Turkish* opinion requires, before a trial court can even consider whether to grant immunity at defense insistence, that not only has the prosecutor failed to take advantage of his opportunity to affirm that the witness is a potential defendant, but that the defendant on trial "demonstrate[ ] that the witness's testimony will clearly be material, exculpatory, and not cumulative." *Turkish, supra,* at 778. In the case at bar, the most appellant has argued is that Quinn's testimony

might have been "material, exculpatory, and not cumulative."

**3.** We note also that his argument that the alleged intimidation was the kind of prosecutorial misconduct for which the proper relief would have been a grant of witness immunity must fail. The claim of intimidation is entirely unrelated to the claim that Grochulski had a right to present Sharon Quinn's testimony.

According to Grant, Baron told Jeziorski he wanted to hide the murder weapon in the latter's apartment and, in return for drugs, Jeziorski agreed. Grant also stated that Janulis had confirmed Baron's "confession" in a conversation some time later.

Outside the presence of the jury, the defense made an offer of proof with regard to the Grant statement, putting Redd on the stand to testify that he was familiar with Grant as an informer whose information, prior to the February, 1976, statement, had ranged from reliable to unreliable. Sometimes, Redd said, Grant's information was unreliable because of his deliberate lying; sometimes the inaccuracies were inadvertent.

Grant–who had a record of intermittent imprisonment on various offenses–was under federal detention for unrelated reasons at the time of Grochulski's trial. He was brought to court and given a Legal Aid Society lawyer after Redd testified. Grant's attorney told the court that under no circumstances would Grant testify at Grochulski's trial.

Baron's "confession" to Grant was hearsay, but it was also an admission against penal interest. As the latter, it might have qualified for admission under the New York version of the admission exception to the hearsay rule. But *People v. Brown*, 26 N.Y.2d 88, 308 N.Y.S.2d 825, 257 N.E.2d 16 (1970), had made it a requirement that the declarant be "unavailable" before such an admission could be received in evidence. *Brown* further defined unavailable to mean, *inter alia*, that the declarant refused to testify "as to the fact of the admission," for example by pleading the Fifth Amendment.

Baron was thus recalled to the stand, still outside the presence of the jury, and shown the Grant statement. He denied that anything in the statement was true, denied that he owned a shotgun, denied ever having been in Jeziorski's apartment, and denied ever having met Grant until after the date of Grant's statement. Baron did invoke the Fifth Amendment when questioned about his relationship to Quinn, Smagalla, Cusick, Janulis and Robert Kortright,

and about his activities on the dates of the crimes.

The trial judge then ruled the Grant statement inadmissible. It could not be received in evidence as an exception to the hearsay rule, he reasoned, because Baron, by testifying, had shown himself not to be "unavailable" as required by *Brown*. Further, Justice Kassal ruled, the statement could not be introduced by the defense to impeach Baron's testimony, because N.Y. Crim.Proc.Law § 60.35 does not allow impeachment by a party of that party's witness, except by means of the witness's prior sworn or written statement. Baron, in the trial court's view, was the defense's witness for the sake of any testimony beyond that involving his name and physical appearance. Finally, Justice Kassal relied on the fact that, as an out–of–court statement reporting an earlier out–of–court statement, the Hudson County transcription was double hearsay, and thus even if Baron's "confession" was an admission against interest it could not be received. This second level of hearsay could have been surmounted if Grant had been willing to testify at the trial directly as to Baron's statement to him, but Grant was clearly unwilling to do so.

Realizing this, the defense had asked the prosecutor if he would immunize Grant in order to overcome Grant's refusal to testify. The prosecutor refused to take a position because of the necessity of conferring with other members of the District Attorney's office.

Grochulski now argues that the prosecutor's failure to immunize Grant deprived him of a fair trial, and that he should have been allowed to impeach Baron with the Grant statement.

■ We reject this argument for all the reasons given earlier in this opinion in our discussion of appellant's claim that Sharon Quinn should have been granted immunity. We further note that with regard to the Grant statement Grochulski's arguments are even weaker. Even if Grant had been immunized, *People v. Brown* stands as a

barrier to the admission of the statement. There would have been no purpose to be served by the immunity, unless the court below was—as Grochulski argues—required to ignore *People v. Brown* because of *Chambers v. Mississippi*.

*Chambers v. Mississippi*, an opinion confined to its facts, may be read to stand for the principle that state evidentiary rules may not unduly intrude into the right to present an effective defense under the Sixth Amendment. In *Chambers*, the Court found that such a denial of a fair trial had occurred when the conjunction of two state evidentiary rules—one prohibiting the impeachment by a party of its "own" witness, and one prohibiting the admission of any hearsay admissions against penal interest—prevented a criminal defendant from introducing strong evidence that another individual had confessed to the crime for which he was on trial.

In *Welcome v. Vincent*, 549 F.2d 853 (2d Cir. 1977), we read *Chambers* to forbid "technical" restrictions (such as state rules prohibiting the impeachment of a party's own witness) from restricting unduly a defendant's right to cross–examine a witness who has confessed to the crime for which he is on trial. *Id.* at 857–58.

■ Despite the surface similarities of *Welcome* and *Chambers* to the case at bar, we think they are clearly distinguishable. In both *Chambers* and *Welcome* the witness on the stand admitted that he had confessed to the crime, but in each case the witness had later recanted. In the case at bar Baron had explicitly denied when questioned that he had ever made a confession. The *Welcome* opinion concluded:

> Our holding is narrowly confined to rare situations of this sort, where another person, present on the witness stand, has previously confessed that he, rather than the defendant on trial, has perpetrated the crime. We hold that to restrict examination of such a witness, so that his prior confession may not be proven, is to deny the defendant a fair trial, at least when the confession, though retracted, has some semblance of reliability . . . .

We disavow any attempt to 'constitutionalize' the law of evidence pertaining to the use of prior statements of a witness . . . .

*Id.* at 858–859. Thus *Welcome* applied *Chambers* to a case in which a witness admitted in the presence of the jury that he had previously made a retracted confessional. In the case at bar, the declarant having denied making such a confession, the witness's testimony was not of significance.

In addition to these differences in posture, it is important to note that both *Chambers* and *Welcome* directed the reviewing court's attention to the reliability of the evidence sought to be introduced by the defendant. *See also United States v. Jenkins*, 496 F.2d 57 (2d Cir. 1974). In *Chambers*, the Court said the confession "bore persuasive assurances of trustworthiness." 410 U.S. at 302–303, 93 S.Ct. at 1049–1050; the defendant sought to show that the witness had confessed to the crime on three different occasions to three reliable witnesses, as well as signing his recanted confession. In *Welcome*, the confession whose plausibility the defense sought to bolster by cross–examination had been considered reliable enough by the prosecutors that two prior (unsuccessful) prosecutions had been brought against the witness.

In this case, by contrast, the reliability of the statement sought to be introduced is of a low order. Grant had a mixed record as an informant. As someone who had spent time in jail prior to this statement to the Hudson County prosecutor's office, he was someone whose report of crimes might not be disinterested. In addition, Grant had reason to lie about the identity of the owner of the shotgun, since it had been discovered in a building of which he was the manager. Finally, Grant's statement lacked corroboration, a factor given considerable weight by *Chambers*, 410 U.S. at 300–301, 93 S.Ct. at 1048–1049; see also *United States v. Guillette*, 547 F.2d 743 (2d Cir. 1976). Not only was the description of the crime in the Grant statement contradicted by the evidence of Karen Smagalla, but Grant's account of how Angel Kortright was killed

contradicted the account given by the eyewitnesses to the murder and medical testimony. The Grant statement said that Angel Kortright was shot when he attempted to seize Grochulski's gun; a medical expert witness testified at trial that Angel had been approximately two feet from the shotgun's muzzle when killed.

The State's case against Grochulski was overwhelming. Three eyewitnesses picked out Grochulski's picture on the first occasion they were shown photos of suspects. Three eyewitnesses chose Grochulski out of a sixteen man line–up in which the defense had chosen the stand–ins. The eyewitness to the getaway car used in the October 20 attempt identified the car as a Cadillac Eldorado, with a light–colored top, probably a 1972. Grochulski's car was a 1971 Eldorado with a white top. Karen Smagalla identified Grochulski as a member of the October 20 robbery team.

Nor do we think that the trial court's refusal to allow the Grant statement to be used for impeachment purposes by itself deprived Grochulski of a fair trial, because *Chambers* and *Welcome* do not countenance the setting aside of a state evidentiary rule such as N.Y.Crim.Proc.Law § 60.35 simply because it seems fairer to the defendant to abrogate the rule. As explained above, *Chambers* and *Welcome* require such a result only under limited circumstances not present here. *See Lipinsky v. New York,* 557 F.2d 289 (2d Cir. 1977). Our review of the totality of the evidence and the circumstances of the trial court's rulings leave us with the conviction that, despite the trial court's reliance on *People v. Brown, supra,*

and N.Y.Crim.Proc.Law § 60.35, Grochulski received a fair trial.[4]

Affirmed.

OAKES, Circuit Judge (dissenting):

I dissent. In my view Grochulski was denied a fair trial by the judge's rulings, under state law, precluding introduction of evidence pertaining to Robert Baron's confession that he committed the crime with which Grochulski was charged. *See Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Welcome v. Vincent,* 549 F.2d 853 (2d Cir.), *cert. denied, Fogg v. Welcome,* 432 U.S. 911, 97 S.Ct. 2960, 53 L.Ed.2d 1084 (1977).

In *Chambers* the Supreme Court held that the combined effect of state evidentiary rules that prohibited the defendant from impeaching his own witness (the "voucher" rule)[1] and that excluded hearsay statements critical to the defense, which bore substantial assurances of trustworthiness, deprived the defendant in that case of a fair trial. 410 U.S. at 298–303, 93 S.Ct. at 1047–1050. This court extended *Chambers* in *Welcome* by holding that a significant restriction on a defendant's examination of a witness who had confessed to the same crime could alone deny a defendant a fair trial in violation of the due process clause of the Fourteenth Amendment. 549 F.2d at 857–59. In *Welcome* the state trial court had applied the voucher rule to restrict defendant's questioning of the witness. The federal district court denied a writ of habeas corpus on the different ground that the confession was insufficiently reliable under *Chambers.* This court rejected both arguments, regarding the first as a techni-

---

4. We are pleased to note that the State in this action is represented by the District Attorney of New York County. In most cases of this nature familiarity with the trial record and all prior proceedings are of paramount importance. Obviously the District Attorney and his assistants who have been involved in these matters are in a better position to inform us than is usually the case with the office of the Attorney General of New York State.

1. The voucher rule rests on the highly debatable premise, going back to the days of "oath–helpers," 3A J. Wigmore, Evidence § 896

(1970), that a party who calls a witness "vouches for his credibility" and, therefore, may not impeach this witness, *Chambers,* 410 U.S. at 295–96, 93 S.Ct. at 1045–1046. In *Chambers,* as in the instant case, a witness had allegedly confessed to the crime with which the defendant was charged, but the court would not permit the defendant to cross–examine this witness because of the voucher rule. As Wigmore says, "there is no substantial reason for preserving this rule–the remnant of a primitive notion...." 3A J. Wigmore, *supra* at 665.

cal restriction inappropriate in the criminal process and noting on the second that the issue of trustworthiness in *Chambers* related only to the hearsay testimony and that the confession itself need have only "some semblance of reliability." *Id.* at 858–59.

Under these cases, therefore, the key issue here involves the reliability of the evidence relating to Baron's alleged confession, and whether the trial court's preclusion of this evidence deprived Grochulski of a fair trial. The majority opinion makes the facts appear cut and dried and hence this issue of little or no moment. It is necessary, however, to restate the facts to establish the appropriate context for evaluating the state evidentiary rulings. The restatement will, I suggest, demonstrate the applicability of *Chambers* and *Welcome* to this case.

I. *Facts*

Two related crimes took place five days apart from each other. Both were engineered primarily by prosecution witness Karen Smagalla, a 16–year–old drug user and former "main–line" heroin addict, go-go dancer, and prostitute, with some help from her friend Sharon Quinn. Smagalla testified at the trial as the result of a plea bargain in which she was permitted to plead guilty to a "Class C" felony, manslaughter in the second degree, with a maximum sentence of 15 years and the expressed "hope" of walking out of the courtroom "without doing any jail time." Each of the two crimes began with the intent to rob Robert Kortright, a supposed drug dealer. In both cases the assailants used the same modus operandi—three husky men, one with a sawed–off shotgun, had a female (Smagalla) pretend to be a hostage to gain entry into the victim's apartment,[2] and after the crime fled in a dark two–door car.

Rather remarkably Smagalla testified that she, with Quinn's help, induced two different groups of three men each to commit the crimes. She stated that appellant Grochulski, who was one of Quinn's boyfriends, John Ek, and Kenneth Borovina participated in the first robbery which, though originally planned for Robert Kortright's apartment, was attempted at his parents' and resulted in the killing of Robert's father, Angel.[3] Then, according to Smagalla, another group of three men, Robert Baron, also one of Quinn's boyfriends, "Pete the Greek" Janulis, and David Cusick, planned and attempted the second robbery, this time at Robert Kortright's apartment, in which Kortright was stabbed. Smagalla further testified that the assailants used Grochulski's car, a blue Cadillac Eldorado which she described as having a hard top, in the first crime. Two teenage boys, bystanders on the street, however, told the police it was a "brown" Eldorado and one of them testified at trial that he saw a two–door "brown" Cadillac Eldorado, first saying it had a "dark" top, then saying he thought it had a "light brown" top. Grochulski's car, in fact it was his brother's, was a 1971 blue Cadillac Eldorado convertible with a white top. The car used for the second robbery, traced through the license plate to Robert Baron, was a "big," two–door maroon 1973 Buick with a black vinyl hard top, described by witnesses to the police and registered in New Jersey as red with a brown top.

Grochulski presented an alibi defense at trial. Robert Garda, a member of the Jersey City Park Police, testified that on the night of the Kortright murder Grochulski was attending a party at Hope Jentis'

---

**2.** According to Smagalla, in the first robbery, although the plan called for Smagalla to pretend to be a hostage to gain entrance to the apartment, Smagalla's assistance was not needed when the assailants discovered that the front door was open. In the second she did pretend to be a hostage.

**3.** It may be noted that Smagalla testified that Grochulski was wearing a "black trench coat"

at the time of the Angel Kortright murder. All the witnesses to the crime, however, testified that the man with the shotgun who shot Kortright had on a jacket, a three–quarter length jacket or a three–quarter length leather jacket.

The bystanders on the street did not say they saw Smagalla though she claimed that she had walked up to the Kortright door with the three men and had then gone to the car.

apartment. Grochulski also presented evidence of mistaken identity; his barber testified as to the "afro" styling of Grochulski's hair a few days before the crime which the barber recorded in a book kept for that purpose. Because the afro style generally lasts from three to four months, Grochulski claimed that he would not have had straight hair on October 20, 1975, as described by witnesses at the Angel Kortright murder scene.[4] Critical to Grochulski's defense, however, was obtaining the admission into evidence of a statement made by Robert Baron in the presence of one Lawrence Joseph Grant that he, Baron, had killed Angel Kortright. This alleged confession, exculpating Grochulski, Ek, and Borovina, was set forth in Grant's sworn and recorded statement to the Hudson County, New Jersey, prosecutor's office. The confession was especially significant in light of the parting remarks of the men at the Angel Kortright crime, testified to by another Kortright son and his daughter who were present at the shooting, that "we will be back to get money from [Robert]."

Baron made his admission against penal interest to Grant, according to the latter's sworn statement, under the following circumstances. Grant first met Baron through drug transactions in which Grant purchased or received free of charge drugs from Baron. Grant was later at the apartment of Drew Jeziorski on 168 Academy Street in Jersey City, New Jersey, when Baron brought the shotgun that killed Angel Kortright to Jeziorski's apartment. Baron asked Jeziorski to hide the shotgun for him because he was afraid the police would raid his own place for drugs, find the gun, and charge him with the murder. According to Grant's statement, "[Baron] said that he tried to rob someone, a man, and during the robbery the man pulled the shotgun he had his fingers on the shotgun and it went off" [sic]. Baron also told Jeziorski and Grant that "a girl named Karen Spingolli" [sic], another drug customer of Baron's, called up Baron to tell him that he could rob Kortright, and through her Baron arranged to rob this man. Baron laughed about the homicide and said that "a man named Pete" was there and "some name like Danny he said was there."

Quite obviously, Baron's statement to Grant had the same three men committing the first crime as committed the second, corroborating what to many people would seem the more reasonable version of what probably occurred.[5] How could, indeed why would, "Spingolli" get an entirely new crew to commit the same crime five days later? And if the shotgun given to Jeziorski was in

---

4. Iris Kortright, after identifying Grochulski, Ek, and Borovina at trial was asked on direct:

   Q. And do you remember what that person looked like, the one with the shotgun?
   A. Well, not–like I saw just the side of his face. I didn't completely see his whole face.
   Q. And what did he look like? Give us a description of the man you saw with the shotgun?
   A. Well, he was about two ·hundred pounds. He had a leather jacket, short, and he was about forty.

   On cross she was to admit that she had not picked Grochulski out of a lineup.
   Rosemary Valentin, Iris's cousin, also identified Grochulski, Ek, and Borovina in court. She had told detectives that the man with the shotgun was "six foot tall, 200 pounds, long dark brown hair." David Kortright, Iris's father and Rosemary's uncle, told the police that the man with the shotgun was 5'7"–5'8", 200 pounds, very heavy, with a goatee. Interestingly, Smagalla testified that Baron might have had a goatee at the time of the Kortright murder and that he might not have–he would grow and then shave off his goatee.

5. Grant's statement went on to say that Baron gave free cocaine to Jeziorski so that the latter would keep the weapon. Grant then recounted going to a bar at a later date to get drugs from Baron and meeting "Pete the Greek" Janulis who recounted how Baron had shot Angel Kortright. According to Grant, Baron showed up at the bar and with "Pete the Greek," laughed about going back to rob the son and cutting him with a knife, and about the fact that both father and son were scared at first and then tried to jump them. Grant denied knowing Grochulski. He added that it was not possible that Baron and Pete were talking about Grochulski's committing the murder because Baron "told me he did it," and said that "if the girl ever ratted he would shoot her" and that Baron wasn't worried about her doing so because she "was to[o] afraid of him."
   Smagalla testified that "Pete the Greek" and Robert Baron hung out at the same bar on Ocean Avenue in Jersey City.

fact the shotgun used to shoot the senior Kortright, as conceded by Grochulski's prosecutor, is it not more reasonable to suppose that Baron, who Grant said was trying to hide the shotgun, actually did the shooting? At the least, I insist, a powerful argument to this effect could have been made on Grochulski's behalf. This is especially so because the Hudson County prosecutor's office had recovered the shotgun from Jeziorski's apartment.

## II. *Trial Court's Evidentiary Rulings*

Having established the importance of Grant's statement and of Baron's admissions to him, we may better view the trial court's rulings. The prosecution called Baron solely as a living exhibit for the jury to compare his appearance with that of the three defendants Grochulski, Ek, and Borovina, and asked him only his name and address. The defense then requested that the court declare Baron to be a hostile witness for its examination of him, but the court ruled Baron to be a *defense* witness for purposes of the voucher rule for all questions going beyond his name and appearance. When asked about events relating to the two crimes, Baron invoked the Fifth Amendment. However, he did acknowledge knowing Grant and Jeziorski but denied having confessed to Grant. Grant himself indicated that he did not wish to testify and, if necessary, would refuse to do so under the Fifth Amendment. He obviously must have been concerned about drug prosecutions.

When the Grochulski defense attempted to offer Grant's statement both to impeach Baron's credibility and as substantive evi-

dence, the court refused to allow this. The court ruled that the statement was inadmissible for impeachment purposes under New York Criminal Procedure Law section 60.35 proscribing impeachment of a party's own witness except by means of the witness' prior sworn or written statement, N.Y. Crim.Proc.Law § 60.35 (McKinney). The court also ruled that the confession was not admissible through Grant as a statement against Baron's penal interest, not because it was unreliable but on the basis that Baron was not "unavailable" as required by a state court evidentiary rule.[6] Finally, the court noted that even if Grant's statement could have been admitted for impeachment or as an exception to the hearsay rule, it would have been inadmissible because of a second–level hearsay problem. In other words, Grant himself was refusing to testify and testimony by the investigator he spoke with would be second–level hearsay.

On the basis of this reasoning the court added that any error regarding its initial evidentiary rulings would be harmless *because* of Grant's refusal to testify. Yet this same court also refused to reach the question of immunity for Grant so that he could testify, because it had already concluded that Grant's testimony would be inadmissible. Thus, the trial court's evidentiary rulings were circular in logic–the court deemed its refusal to admit the Grant statement for impeachment or substantive evidentiary purposes to be harmless error because of the second level hearsay problem, but it saw no need to reach the immunity issue which would solve this hearsay problem because Grant's testimony was declared inadmissible as either impeachment or substantive evidence. In any event, the trial

---

**6.** The trial judge relied on *People v. Brown*, 26 N.Y.2d 88, 308 N.Y.S.2d 825, 257 N.E.2d 16 (1970). There the Court of Appeals held that

The rule in New York should be modernized to hold that an admission against penal interest will be received where material and where the person making the admission is dead, beyond the jurisdiction and thus not available; or where he is in court and refuses to testify as to the fact of the admission on the ground of self incrimination.

26 N.Y.2d at 94, 308 N.Y.S.2d at 829, 257 N.E.2d at 19. The *Grochulski* trial judge took

the New York Court of Appeals literally, holding that since Baron *denied* the admission rather than refusing to testify about it on the ground of self–incrimination he was not unavailable. Thus the ruling that the defense could not impeach Baron as to matters other than his name and appearance took on added importance. It was the cumulation of the rulings, here as in *Chambers*, that kept the Baron statement to Grant out of the evidence before the jury.

court's exclusion of the Grant statement, so critical to the defense, was improper under *Chambers* and *Welcome.*

### III. *Applicability of Chambers and Welcome*

The majority upholds the trial court's evidentiary rulings primarily by distinguishing *Chambers* and *Welcome* on the basis that in each "the witness on the stand admitted that he had confessed to the crime, but in each case the witness had later recanted." Op. at 55. To me this is a distinction without a difference. It may go to the reliability of the confession, as discussed below, but I read neither *Chambers* nor *Welcome* to rest on the fact that the witness himself admitted making the confession which he later recanted. The majority states that "In the case at bar, the declarant [Baron] having denied making such a confession, the witness's [Grant's] testimony was not of significance." *Id.* This is a non sequitur. The witness, Baron, having denied making the confession, it was all the more crucial to the defense to get the confession into evidence. I had never thought that the admissibility of a third party's statement against penal interest going to the heart of a defense—a confession by another to having committed the crime in question—depended on whether the declarant admitted making the statement. The majority refers us to no case so holding.

Rather, *Chambers* and *Welcome* both apply when the confession itself has "some semblance of reliability," *Welcome,* 549 F.2d at 859, and any related hearsay statements "[were made] under circumstances that provided considerable assurance of their reliability," *Chambers,* 410 U.S. at 300, 93 S.Ct. at 1048. The issue, then, is one of reliability or, more specifically, whether other evidence corroborates the trustworthiness of the statement. *See* Fed.R.Evid.

804(b)(3), 804(b)(5). Here, despite the fact that Baron denied making the admission to Grant and that Grant had a mixed record as an informant, it seems to me that the above "reliability" tests were met.[7] I find the following factors telling:

1. Grant and Baron were close acquaintances, with Grant, by his own admission, being one of Baron's drug customers. Baron made his statements, to Grant or in Grant's presence, spontaneously, shortly after the crime, under circumstances—the need to conceal the shotgun—providing adequate motivation for making them.

2. Jeziorski's landlord actually found the shotgun, which like the one used in the Kortright killing was sawed–off, corroborating Grant's story that Baron hid the weapon with Jeziorski.

3. The modus operandi of the two crimes was much the same, again tending to corroborate the admission.

4. Grant's statement regarding Baron's admission demonstrates intimate knowledge of the two crimes including how both Kortright father and son were frightened at first and tried "to jump" the robbers, as well as Karen "Spingolli's" apparent motives for engineering the crimes—to continue to get drugs from Baron—and for falsely accusing Grochulski—to avoid any reprisal from Baron or Baron's own drug supplier, one Negron. To me, the statement has a ring of truth.

5. The threat made by the first gang at Angel Kortright's apartment that "we will be back to get money from [Robert]" in and of itself tends to indicate that the same gang committed both crimes.

6. The witness at the Angel Kortright scene testified that the getaway car was a "brown" Cadillac Eldorado, with a dark or light brown top. Grochulski's brother's car, though a Cadillac Eldorado, was a blue con-

---

7. Questions regarding the reliability of the confession and the reliability of related hearsay statements cannot be separated out analytically because the confession *may* be founded on the admissibility of hearsay testimony. Of course, had the trial court allowed in Grant's statement by limiting the applicability of the voucher rule, or by regarding it as a statement against penal interest by Baron, as I think it should have, then we would be concerned only with the reliability of the confession and not of any hearsay. But if the so–called hearsay statements could only be admissible under *Chambers* then their reliability too is at issue.

vertible with a *white* top, while Baron's car, a "big" 1973 Buick, was maroon with a black vinyl top. The teenage witnesses may well have mistaken a big 1973 Buick for a 1971 Cadillac, and the color description certainly is closer to Baron's car.

7. Baron and Grochulski were to some extent look–alikes–one 6'2", the other 6'3"; one 195 pounds, the other 200 pounds; each with "afro" hairstyles, at least at the time of the crimes.

8. Baron, it appears certain, committed the second crime and his car, traced by the license plate, was used in it.

9. Smagalla's story, insofar as it implicates Grochulski, is rather remarkable in that she was able to enlist two entirely different sets of three men to seek to rob her "friend," drug dealer, and sometime companion only a few days apart. Her story is weak in significant details.[8]

To be sure, as in *Chambers* and *Welcome*, there was evidence which could lead a jury to other inferences,[9] including the identification testimony by the victims of the first crime. But the charge here was murder and the evidence above is sufficiently persuasive to corroborate the reliability of Baron's statements as related by Grant. These statements were critical to the defense because they exculpated Grochulski, and the trial court erred in not admitting them.

First, the trial court should have allowed the statements in to impeach Baron's credibility. The majority opinion, citing *Lipinski v. New York*, 557 F.2d 289 (2d Cir. 1977), *cert. denied*, 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1978), argues that *Welcome* required setting aside the voucher rule "only under limited circumstances not present here." Op. at 56. But in *Lipinski* this court upheld the New York voucher rule, N.Y.Crim.Proc.Law § 60.35 (McKinney), when the witness' testimony was not critical to the presentation of an effective

defense. 557 F.2d at 294. Here, as in *Welcome*, the excluded evidence related to a confession to the crime for which the defendant was being tried. Here, as in *Welcome*, a fair trial required limiting the applicability of the New York voucher rule.

Second, the trial court should have permitted the defense to introduce Baron's statements to Grant as substantive evidence. Baron's confession was a statement against penal interest, with corroborating circumstances to indicate the trustworthiness of the statement. A mechanistic application of this crucial evidence was simply inexcusable. *See Chambers*, 410 U.S. at 302, 93 S.Ct. at 1049. I say "mechanistic" because it seems to me that a declarant who denies making the admissions yet claims his Fifth Amendment right as to all questions pertaining to the facts is "unavailable" under the New York rule.[10]

Finally, the problem of second-level hearsay is not directly at issue because the trial court, as explained above, never dealt adequately with the defense requests to provide Grant with immunity to testify. Nevertheless, accepting arguendo that the only means for getting Baron's confession into evidence would have been through hearsay testimony, forbidding such hearsay created a situation in which a combination of state evidentiary rules prohibiting Grochulski from impeaching his own witness (the voucher rule) and excluding critical, reliable hearsay statements severely limited the effectiveness of the Grochulski defense. This situation is precisely what the Supreme Court in *Chambers* held to constitute denial of a fair trial.

For the reasons stated in *Chambers* and *Welcome*, I believe that the state evidentiary rules/rulings here operated to deprive Grochulski of a trial in accord with traditional and fundamental standards of due process. Testimony regarding Baron's confession should have been submitted to the

---

**8.** *See* note 3 *supra.*

**9.** For example, Baron may have tried to conceal the weapon only because it was "hot"; he may have learned of the killing of Angel Kortright from Smagalla or Quinn; and it is of

course possible that Grochulski's car, despite its white top, may have been used in the first crime, rather than Baron's, with its black top.

**10.** *See* note 6 *supra.*

jury as part of its consideration of all the evidence to determine whether the defendant was guilty beyond a reasonable doubt. "[T]hat the right to present an effective defense inheres in the guarantee of a fair trial," as Judge Garth pointed out in *Virgin Islands v. Smith,* 615 F.2d 964, 971 (3d Cir. 1980), is to me as clearcut as any principle of law.

