James David AUTRY,
Petitioner-Appellant,

v.

W.J. ESTELLE, Jr., Director, Texas
Department of Corrections,
Respondent-Appellee.

No. 83–2053.

United States Court of Appeals,
Fifth Circuit.

June 17, 1983.

Rehearing and Rehearing En Banc
Denied Aug. 4, 1983.

---

Provost, Umphrey & McPherson, Charles D. Carver, Port Arthur, Tex., for petitioner-appellant.

Leslie A. Benitez, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before CLARK, Chief Judge, POLITZ and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

James David Autry asks that we set aside his death sentence imposed by a Texas court upon his conviction for murdering a clerk while attempting to rob a convenience store. Autry argues that in five respects the United States District Court was in error in refusing his petition for writ of habeas corpus: first, the state trial court wrongfully denied immunity to a necessary defense witness; second, an oral statement was illegally admitted; third, an extraneous offense was improperly admitted at the sentencing phase; fourth, there was insufficient evidence of an attempted robbery; and fifth, there was insufficient evidence that it was Autry who killed the clerk. Finding each claimed error to be without merit, we affirm the district court's dismissal of the petition for habeas corpus.

I.

On the evening of April 20, 1980, Port Arthur, Texas police received a report of a shooting at a Sak-N-Pak grocery store. Arriving officers found Joseph Broussard, a Catholic priest, lying dead on his back with a telephone in his hand, shot through the neck and head; Shirley Drouet, the grocery clerk, seated near a grocery display dying of a gunshot to the forehead; and Anthanasios Svarnas, a Greek seaman, lying seriously wounded in the store parking lot. The cash register was turned to an off position, its register tape showing that the last sales were of cigarettes. Nothing was taken from the cash register or the victims, although Broussard had cash in his wallet as did Drouet in her purse.

Within four hours, John R. Sandifer arrived at the Port Arthur police station accompanied by his two sons, John Alton and Mark. Based on his statement John Alton Sandifer was arrested and an arrest warrant for Autry was issued. Two pistols, of .32 and .38 caliber, brought to the station by the Sandifers were secured as evidence. Mark Sandifer had taken the pistols from James David Autry shortly before the stationhouse trip. Port Arthur police officers Gary Martin and Bill Edmonds were told by radio of the outstanding warrant and at about 1:45 a.m. arrested Autry at the trailer-house he shared with John Alton Sandifer. Detective Edmonds told Autry he was

being arrested for the two murders at the Sak-N-Pak store, Drouet having died in the meantime, and gave full *Miranda* warnings. Officers searched the trailer with Autry's consent and, at 3:00 a.m., took him before Judge Knowles, a state magistrate, who gave the warning required by Texas statute.[1]

After the appearance before the magistrate and for the next two hours, until approximately 5:30 a.m., Detectives Waylon Hughes, R.B. White and Calise Blanchard questioned Autry at the stationhouse. Autry made no statement and Hughes and Blanchard left for breakfast. Shortly thereafter, Officer Gary Martin, who had not participated in the earlier questioning, seeing that Autry was alone in an interrogation cubicle, talked with Autry about the shootings, and at 6:30 a.m. Autry signed a written statement. The questioning then stopped and Autry was placed in a cell. But Officer Martin did not then know that Autry had terminated his earlier interview with a written statement that did not incriminate him, and ended as follows: "I have nothing else to say 'cause every time I say something or give a fact they say I'm a liar."

A little over six hours later, at about 1:00 p.m., Autry was in response to his request taken to the "booking room" where he was allowed to telephone his mother. Officer John Anderson testified at trial that he had no connection with the Autry case but happened to be in the room when Inspector Baxter brought Autry in to use the telephone. Baxter dialed a number and Autry spoke to the person on the other end. Anderson recounted what he heard for the jury:

Q. What did you hear the defendant say?

A. Whoever he was talking to on the other end he told them that he was in Port Arthur Jail. And that he was charged with two counts of murder.

Q. What happened then?

A. Okay. There was kind of a pause. And I assume whoever was on the other end was saying something. And he said that he had gone into this store and he was going to rob it but it just gone bad.

Q. What did he say then?

A. He said that he started shooting but once he started he just couldn't stop.

Q. Okay. Did he say anything else?

A. If I remember right towards the end of the conversation he stated that whoever was on the other end should not worry because he was going to get out of it.

Autry was indicted for capital murder under Tex.Penal Code § 19.03(a)(2). That statute provides that a person commits the offense of capital murder if he intentionally commits the offense of murder "in the course of committing or attempting to commit ... robbery." Before trial and after a hearing, Autry's motion to suppress his written statement was granted. The state trial court found that the police officers had not honored Autry's request to remain silent. He denied Autry's motion to suppress his oral statements overheard by Officer Anderson. At trial, it was developed that Autry's telephone call from the booking room was to his mother. The oral statements were admitted over his objection that they were tainted by the illegality that accompanied the written statement he had given approximately six and one-half hours earlier.

---

1. Tex.Code Crim.Proc. art. 15.17 provides: "The magistrate shall inform in clear language the person arrested of the accusation against him and of any affidavit filed therewith, of his right to retain counsel, of his right to remain silent, of his right to have an attorney present during any interview with peace officers or attorneys representing the state, of his right to terminate the interview at any time, of his right to request the appointment of counsel if he is indigent and cannot afford counsel, and of his right to have an examining trial. He shall also inform the person arrested that he is not required to make a statement and that any statement made by him may be used against him."

John Richard Sandifer, Judy Francis Sandifer and Mark Sandifer testified for the state. All had been granted immunity over Autry's objection. Despite Autry's request, Texas refused to grant immunity to John Alton Sandifer, and, out of the jury's presence, he invoked the Fifth Amendment when called by Autry at trial.

The jury returned a verdict of guilty and, after a sentencing proceeding, answered "yes" to the first two questions required by Tex.Code Crim.Proc. art. 37.071(b). These answers under Texas law mandated the sentence of death which followed.[2]

On direct appeal to the Texas Court of Criminal Appeals, Autry assigned three grounds of error: (1) that there was insufficient evidence that the killing occurred during the course of a robbery or attempted robbery; (2) that circumstantial evidence was insufficient to exclude the hypothesis that another was guilty; and (3) that Autry's oral telephone statements should not have been admitted. The Court of Criminal Appeals affirmed on January 16, 1982, *Autry v. State*, 626 S.W.2d 758, and denied Autry's motion for rehearing on February 10, 1982. The Supreme Court denied certiorari on October 4, 1982. *Autry v. Texas*, —— U.S. ——, 103 S.Ct. 180, 74 L.Ed.2d 147.

The 252nd District Court of Jefferson County, Texas then on November 5, 1982, issued a Death Warrant to be executed on December 17, 1982. Autry's state habeas effort ended with its denial by the Texas Court of Criminal Appeals on December 14, 1982. That same day, Autry filed for federal habeas in the United States District Court for the Eastern District of Texas.

That court, on December 15, 1982, stayed the execution, pending evidentiary hearings held on January 5 and 6, 1983. On January 14, 1983, the district court denied Autry's habeas petition and vacated the stay. At the same time, he issued a certificate of probable cause. Autry's execution date was then set a second time by the state court for February 21, 1983. Autry's unopposed request to this court for stay of execution pending appeal was granted by this panel on February 17, 1983.

All issues presented to this court in this collateral attack have been presented to the state courts of Texas, either on direct appeal or by habeas, and no question of exhaustion of remedies is presented.

We turn to the claims, pausing only at the standard of review. This is a collateral attack upon a state court conviction found valid by the highest court of that state. The collateral character of the attack and the concern of federalism it triggers result in marked differences in the standard of review from that controlling the direct appeal of federal convictions. We will note these differences as they surface with each distinct claim of Autry, emphasizing now only our awareness throughout both that we review the solemn judgment of a state's highest court, and that it is the Great Writ that brings Autry to this court.

## II.

Autry urges that his conviction or death sentence, or both, must be set aside for five reasons. We will review them seriatim, noting at the outset that despite the bifurcated adjudication of guilt and sentence under Texas law, error that infects only the

2. Art. 37.071(b) requires that in a capital case, the court shall submit the following issues to the jury:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

The prosecution must prove each issue beyond a reasonable doubt. Tex.Code Crim.Proc. art. 37.071(c). If the jury returns "yes" answers on all issues submitted, "the court shall sentence the defendant to death." *Id.* at 37.071(e).

Only the first two issues were submitted to the jury at Autry's sentencing proceeding. No contention has been made that the evidence warranted submission of the third issue.

sentencing phase entitles a defendant to a new jury trial upon guilt as well. Tex.Code Crim.Proc. art. 44.24(b). Thus, while our focus will shift with the claims from the trial to the sentencing phases, the consequence of constitutional error is the same—a new trial.

### A.

#### 1. *Immunity Grants—The Factual Background*

Autry first urges that he was denied his Fifth, Sixth and Fourteenth Amendment rights by the state's refusal to grant immunity to John Alton Sandifer, said to be a "critical defense witness," while granting immunity to three other Sandifers—John Richard, the father; Mark, the other son; and Judy Francis, Mark's wife. Before the state opened its case and after jury selection, the state requested the immunity grants. The trial court, out of the jury's presence, conducted a hearing on the state's request. At the hearing, the three Sandifers appeared with counsel. Each told the court that he or she would invoke the Fifth Amendment if called to testify. The prosecutor represented that each was critical to the state's case, but did not detail the relevancy of their expected testimony.

Autry objected to the grant of immunity unless John Alton Sandifer was also granted immunity. John Alton was then under indictment for capital murder. After the immunity grants, Autry called John Alton Sandifer to testify at the hearing, but he appeared with counsel and refused to testify without immunity. Autry again requested that John Alton be granted immunity, urging that his testimony "is material to our defense." Like the state, Autry did not detail the relevancy of John Alton's expected testimony. The request was denied. Autry then offered to prove that the state had offered to

> ... dispose of the capital murder charges against John Alton Sandifer. They do not in good faith intend to prosecute this man on the charge of capital murder. They are leaving the charge pending against him to deprive us of a witness we need in our defense.

The request to "pursue this line" was denied "[b]ased on the fact that defense counsel has no standing to request the court to grant immunity ..." His request to "perfect my bill to show what his testimony would be" was denied. Each of the state's immunized witnesses testified at trial.

The father, John Richard Sandifer, explained to the jury that he and his son Mark had gone to a trailer-house in the late evening on April 20, 1980, where Mark obtained two pistols which belonged to him and picked up his brother, John Alton; that they took John Alton and the pistols to the police station. Autry developed, in the presence of the jury, that John Richard Sandifer was testifying under a grant of immunity, and that the state had offered John Alton twenty-five years for a plea to a burglary charge.

Mark testified that around noon on April 20, 1980, he loaned his 1978 El Camino to his brother, John Alton. Mark explained to the jury that he did not see his brother again until around 9 p.m. that night when he saw the loaned car parked at a Sak-N-Pak with Autry standing by it. Angry that his brother had been gone with his car so long, he stopped and asked Autry where his brother John Alton was. Autry replied that he was in the store. John Alton then exited the store and got into the El Camino. He told Mark to follow him to the trailer. Autry got into the car with Mark and Mark's wife and children and they followed the El Camino out. Mark testified that he did not see a body in the parking lot when he left. He related that Autry then asked him to stop the car. When he did so, Autry got out, pulling a chrome-plated, stainless steel pistol, and ran back toward the store which two men were approaching.

Mark followed the El Camino to his brother's trailer, picked up the El Camino, his wife driving his car, and left. Finally, he described, as did his father, the trip to the trailer where John Alton and the guns were picked up. He added that when he asked Autry for his father's guns, Autry

pulled his father's chrome-plated pistol from his pocket and gave it to him. He explained that Autry reluctantly produced the second pistol, but "told me that he wasn't going to give it to me ... because he knew that I knew—he knew that I knew that he killed some people.... He told me that he killed four people. He said that I just killed four people and you know it." Mark then identified state's exhibits as the two guns. Autry developed on cross-examination the details of the immunity grant and an offer to dismiss John Alton's case for a plea to a burglary charge.

Mark's wife Judy confirmed Mark's testimony regarding their arriving at the Sak-N-Pak store at around 9 p.m. and Autry's return to the store. As with her husband and father-in-law, Autry exploited the immunity grant in the jury's presence.

At the evidentiary hearing held by the United States District Court in January 1983, additional evidence was developed regarding the plea agreement between the state and John Alton Sandifer. Ronald W. Plessela, one of two attorneys appointed to defend him, testified he first commenced plea negotiations on May 27, 1980, some four plus months before Autry's trial. In September, the trial court granted John Alton's motion to quash certain prior convictions which gave strength to his negotiating position. The plea agreement was concluded on October 17, 1980, after the verdict in the Autry trial. It called for seven years on a burglary of a habitation charge, with a dismissal without prejudice of the two counts of capital murder. During the trial, the posture of John Alton and the state was that there was agreement that the charge would be burglary, but they were apart over punishment at twenty and five years, respectively.

At the federal habeas hearing there was also evidence of the testimony that John Alton Sandifer might have offered if immunized. That evidence included his "confession" given to the police on April 21, 1980. John Alton there told Port Arthur police that when he brought a six-pack of beer to the counter, the clerk asked for $2.70; that

"Autry pulled a gun from somewhere and said, 'Here is your $2.70,' and then shot the clerk ..." It was also developed that in one of Autry's written statements to the police he identified John Sandifer as the triggerman and robber and in the other written statement he shared responsibility for the robbery and killing. John Alton Sandifer initially invoked the Fifth Amendment at the federal hearing, pointing out that the dismissal of the capital murder charges was without prejudice, but later offered limited testimony to the effect that he understood that the murder charge would be dismissed in exchange for his plea to the burglary charge. He explained that he was not "going to testify to anything that would incriminate myself at any time." Naman, the prosecutor, testified that he was unaware of any charge that could have been made against the three immunized witnesses and that he requested immunity only because they stated they would not otherwise testify. He explained that he did not know until the immunity hearing that Autry wanted John Alton to be granted immunity.

### 2. Defensive Entitlement to Immunity— The Legal Theory

Autry urges this court to follow the lead of the Third Circuit in recognizing a Sixth Amendment-rooted right to immunization of a witness whose testimony would be exculpatory and essential to his defense. See *United States v. Morrison,* 535 F.2d 223 (3d Cir.1976); *United States v. Herman,* 589 F.2d 1191 (3d Cir.1978), cert. denied, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979); *Government of Virgin Islands v. Smith,* 615 F.2d 964 (3d Cir.1980). In *Herman,* the Third Circuit concluded that:

The defendant must be prepared to show that the government's decisions were made with the deliberate intention of distorting the judicial fact finding process. Where such a showing is made, the Court has inherent remedial power to require that the distortion be redressed by requiring a grant of use immunity to defense witnesses as an alternative to dismissal.

*Id.* 589 F.2d at 1204. In *Smith,* the Third Circuit continued to develop its *Morrison* ruling, finding the need for " 'judicial' immunity . . . to be triggered, not by prosecutorial misconduct or intentional distortion of the trial process, but by the fact that the defendant is prevented from presenting exculpatory evidence which is crucial to his case." 615 F.2d at 969. In sum, the Third Circuit now holds that where a witness has essential exculpatory evidence, a defendant is entitled to his immunized testimony by judicially conferred immunity unless outweighed by strong government interests.

We considered these arguments and rejected them in *United States v. Thevis,* 665 F.2d 616 (5th Cir.1982). After reviewing the Third Circuit case law, and that of sister circuits, we held:

[D]istrict courts may not grant immunity to defense witnesses simply because that witness has essential exculpatory information unavailable from other sources.

*Id.* at 639. In *Thevis,* we followed the Second Circuit's decision in *Turkish* in finding the role of dispensing immunity not to be "a task congenial to the judicial function." *United States v. Turkish,* 623 F.2d 769, 776 (2d Cir.1980), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981). At least when there is no governmental abuse, we held that "the immunity decision requires a balancing of public interests which should be left to the executive branch." 665 F.2d at 639–40. In sum, while we left open the possibility of relief for abuse of the immunity process, we rejected the Third Circuit view. *Id.* at 640–41. Recently, we have reaffirmed our *Thevis* decision. *United States v. Heffington,* 682 F.2d 1075, 1081 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 734, 74 L.Ed.2d 957 (1983). *See also United States v. Fricke,* 684 F.2d 1126, 1130 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1250, 75 L.Ed.2d 480 (1983).

■ We also reject Autry's urging to abandon our *Thevis* holding in favor of the more hospitable Third Circuit view. We do so for the reason that one panel cannot overrule another and for the reason that

Autry can gather no comfort even from the rule he urges us to adopt. Differences among the circuits are here a strawman because Autry fails all their tests. He is in no position to plead for the accommodation of admittedly differing judicial views. The district court, after a two-day evidentiary hearing, concluded in detailed and thoughtful findings that "the decision was not 'made with the deliberate intention of distorting the judicial fact finding process,' but rather was based on legitimate, bona fide prosecutorial interests." He reasoned, "It is more plausible that the state's decision was based on a legitimate, bona fide concern that giving use immunity to Sandifer might jeopardize a later prosecution of Sandifer for any crime relating to his immunized testimony, by requiring the state to prove that none of its evidence was the fruit of that testimony." Critically, the district court found that Sandifer's written statement "not only did not clearly contradict the state's charge that he and petitioner were committing or attempting a robbery at the time of the murder, but also clearly supported the state's charge that petitioner had fired the fatal shot . . . It appears that the state's case actually would have benefited from Sandifer's testimony . . ." Those findings were not clearly erroneous. And whether shielded by the clearly erroneous rule or not, our independent examination of the entire record leads us to the same conclusion. Indeed, the evidence points in precisely the opposite direction from that urged by Autry.

■ We also note that each witness granted immunity was important to the state's case and that nothing suggested any criminal conduct by any of the immunized witnesses. That is, the grants were plainly reasonable. While there is no requirement of symmetry in the treatment of prosecution and defense witnesses, *see United States v. Thevis,* 665 F.2d at 641 n. 28, it is instructive in this review of claimed abuse to observe that John Alton Sandifer was differently situated in two striking ways: he had serious criminal problems of his own and could bring little that was helpful to the defense table.

We differ with the Third Circuit both in our unwillingness to find judicial authority to immunize witnesses and in our view of the nature of prosecutorial conduct that might rise to the level of a deprivation of a defendant's constitutional rights. But it is in federal prosecution that we have noted that judges lack authority to immunize witnesses. We have not addressed the claim in a federal habeas attack upon a state criminal conviction. The Second Circuit has in *Grochulski v. Henderson*, 637 F.2d 50, 52–53 (2d Cir.1980), *cert. denied*, 450 U.S. 927, 101 S.Ct. 1383, 67 L.Ed.2d 358 (1981), wherein it applied its *Turkish* standard established earlier for federal prosecutions. The Second Circuit held in *Grochulski* that immunity was properly denied because the putative defense witness was a "potential target of prosecution." *Id.* at 53 (quoting *Turkish*, 623 F.2d at 778).

Texas recognizes a judicial role in the immunization of witnesses, but that role is not materially different from the federal scheme in the sense that such immunizations are allowed only at the behest of the prosecution. That is, Texas places primary control over immunization in its executive branch of government. The state judiciary provides only a general check over that wide executive discretion.

The Texas scheme has recently been summarized as follows:

> Though a procedure for grant of immunity has not been expressly provided by the Legislature, as the Court demonstrated in *Ex parte Muncy*, 72 Tex.Cr.R. 541, 163 S.W. 29 (1914), 'The right under our law of the district attorney, with the knowledge and consent of the district judge, to guarantee immunity from prosecution and punishment has never been seriously questioned in this state,' *id.,* at 38. The then extant statutory authority for the grant, *id.,* at 45 and 54, similar to provisions in predecessor codes cited in earlier decisions to the same effect, e.g., *Barrara v. State,* 42 Tex. 260, 263 (1875); *Camron v. State,* 32 Tex.Cr.R. 180, 22 S.W. 682 (1893); *Ex parte Greenhaw,* 41 Tex.Cr.R. 278, 53 S.W. 1024 (1899), have

since been melded into Article 32.02, V.A. C.C.P. See *Washburn v. State,* 164 Tex. Cr.R. 448, 299 S.W.2d 706 (1956).

*Ex Parte Moorehouse,* 614 S.W.2d 450, 453 n. 3 (Tex.Cr.App.1981) (Clinton, J., concurring).

Autry's claim is that he was deprived of his constitutional rights by the state's refusal to immunize John Alton Sandifer. He makes no claim that state procedures were not followed. Our refusal to entertain such claims in federal prosecution is not fully apposite insofar as it has been bottomed on separation of power concerns and our opinion that federal judges lack such power in federal prosecutions. On the other hand, Texas law also gives the prosecutor, not the trial judge, the right to initiate grants of immunity as recognized in the state trial court's ruling that Autry lacked "standing" to request immunity. A constitutional rule of defense witness immunity for state trials should permit states to give their own prosecutors the same independence that federal prosecutors have under Article II of the Constitution. The principles of federalism, it would seem, demand no less.

■ We decline here to articulate a definitive rule by which such a claim of prosecutorial abuse will be measured. We are persuaded that we ought not to engage in a direct weighing of prosecutorial and defense interests in federal habeas attacks on state court convictions for reasons similar to those underlying our *Thevis* rejection of the Third Circuit construct. It follows that a state prisoner seeking federal habeas must show that the state had no legitimate purpose for refusing immunity and did so to deprive the defense of essential exculpatory testimony. Thus viewed, there was no use here by Texas of its power to immunize in a manner rendering the trial fundamentally unfair or depriving Autry of any constitutional right to compulsory process.

■ We have detailed the testimony given by the three immunized state witnesses and their relationships to the events of April 20, 1980. That their testimony was vital to the state's case and that they had virtually no exposure to criminal liability

cannot be seriously denied. It follows that the decision to extend immunity was indisputably a reasonable exercise of discretion. On the other hand, the state was asked on the eve of trial to grant immunity to John Alton Sandifer who then faced two counts of capital murder and whose value to the defense based on all objective evidence was zero. Except in the sense that it leveled charges for which there was strong evidentiary support, the state was not responsible for the immediate cause of John Alton's unavailability—his invoking the Fifth Amendment. Moreover the federal district court found after an evidentiary hearing that the refusal was for legitimate state ends. Otherwise stated, neither the charge against John Alton nor its disposition was for the principal purpose of denying Autry his testimony. It follows that the state trial court's refusal to grant Sandifer immunity was not constitutional error.

## B.

■ Autry argues that evidence of his telephone conversation with his mother should have been suppressed as a fruit of his earlier tainted and suppressed written statement. The trial judge after the evidentiary hearing found the oral statement to have been voluntarily made and not the product of oral interrogation. We find no constitutional error in the receipt of this evidence.

The sequence of events is easily capsulated:

*April 21, 1980*

1:50 a.m.  Autry arrested

3:00 a.m.  Autry before magistrate

6:30 a.m.  Autry gives written statement later suppressed

1:10 p.m.  Autry telephones his mother from booking room (overheard by Anderson)

The written confession given at approximately 6:30 a.m. was suppressed following a pretrial hearing on admissibility. *See Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Autry claimed he was physically and verbally abused, in testimony contradicted by the interrogating officers.

The state trial judge did not directly resolve that dispute but suppressed the written statement because Autry had shortly before given a handwritten statement which concluded, "I have nothing else to say." The trial court found:

[T]he evidence shows that he did indicate that he wished to stop the interrogation. And the Court further finds that this indication by the Defendant was not scrupulously honored by the law enforcement officers.

Later, Autry requested permission to telephone his mother in Florence, Colorado. He was taken from his cell to the booking room where he placed the call. The "jail inspection log" reflects that Autry was checked out from his cell by Officer White at 11:25 a.m. and returned at 1:10 p.m. The identity of all persons present in the booking room is unclear. Only Officer Anderson testified as to the persons present in the booking room. He testified that Autry was brought in by Inspector Baxter. No mention was made of Officer White.

Officer Anderson testified that he was in the booking room for other purposes when he accidentally overheard Autry's end of the conversation. Autry's mother testified at trial. Her recollection and Anderson's were remarkably close. They differed, crucially, on whether Autry's statements were of what he did or what he was charged with doing. That a call was made to the mother's home in Florence, Colorado was also confirmed by telephone company records admitted at trial. At the suppression hearing, Autry denied memory of the phone call altogether. In sum, there is no evidence that the conversation was coerced; all the evidence indicates that it was voluntarily made, as the trial judge indeed found.

Autry points to *United States v. Bayer,* 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947), arguing:

Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having con-

fessed. He can never get the cat back into the bag.

*Id.* at 540, 67 S.Ct. at 1398. The argument continues that the phone conversation must be suppressed as the fruit of the earlier written confession.

██ The problem with Autry's argument, however, is that even in the "subsequent confession" context but-for nexus has never been the governing legal standard. As the Supreme Court went on to note in *Bayer,* "In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." *Id.* at 540–41, 67 S.Ct. at 1398–1399. Rather, the measure of whether Autry's conversation with his mother was "tainted" by his earlier suppressed statement is whether it was "sufficiently an act of free will to purge the primary taint" of the suppressed statement. *Brown v. Illinois,* 422 U.S. 590, 598, 602, 95 S.Ct. 2254, 2259, 2261, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963).

Judged by this stricter "subsequent confession" standard, the decision to admit the phone conversation was unquestionably a correct one. Of course any coercion that surrounded a suppressed statement might be relevant to later oral declarations. But some six hours had passed before the telephone call during which Autry was allowed to sleep in his cell. Autry requested permission to telephone his mother. The accidentally overheard phone comments were not merely voluntary, they were volunteered. The salient facts are that Autry's conversation was not the product of resumed custodial interrogation, nor was it directed to any custodian. Hence, such cases as *United States v. Nash,* 563 F.2d 1166 (5th Cir.1977), and *Gilpin v. United States,* 415 F.2d 638 (5th Cir.1969), where the taint of one interrogation was held to have carried over to a later interrogation, are not applicable. Of course custody itself

has an inherently coercive dimension. While relevant to the inquiry into whether an oral statement to one's custodian was voluntary, the fact of custody alone cannot control Autry's case. Such a holding would effectively adopt an improper, illogical "but-for" standard for Autry's conversation confiding his crimes in his mother.

If Autry thought the cat was out of the bag, nothing more compelled him to tell his mother what happened. Even if the earlier statement made it easier to tell the story again for the reason that it seemed pointless not to do so, this only establishes a but-for nexus between the two statements. There is nothing of record to fault the conclusion of the state trial judge that the conversation was voluntary and the conclusions of the Texas Court of Criminal Appeals and the United States District Court that the state carried its burden of proving the conversation to be "sufficiently an act of free will to purge the primary taint." This decision is undergirded by record evidence addressed by unchallenged procedures such that the state court findings are entitled to the presumption of correctness. *See* 28 U.S.C. § 2254(d). Regardless, even if we viewed these as such a mixed question of law and fact as to require independent review, and we do not, we would agree with the determinations below that Autry's conversation with his mother was voluntarily made and not the product of custodial interrogation, and that the state carried its burden.

## C.

██ At the sentencing phase of the trial, over Autry's objection that the jury was improperly being informed of an extraneous offense, the state offered into evidence jail records reflecting that Autry was in jail on a charge of felony theft and was released on the afternoon of the robbery. We review this evidentiary ruling by the standard that "the erroneous admission of prejudicial evidence can justify habeas corpus relief only if it is material in the sense of a crucial, critical, highly significant factor." *Anderson v. Maggio,* 555 F.2d 447, 451 (5th

Cir.1977); *Cronnon v. State of Alabama,* 587 F.2d 246, 250 (5th Cir.), *cert. denied,* 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 792 (1979). We find no constitutional error.

Under Texas law, a death sentence flows automatically from affirmative jury findings to two questions.[3] The questions, answered affirmatively here, were:

> Number one: do you believe beyond a reasonable doubt that the conduct of the defendant that caused the death of the deceased was committed deliberately and with reasonable expectation that the death of the deceased or another would result?
>
> Answer: yes.
>
> Number two: do you believe beyond a reasonable doubt that there is a probability that the defendant could commit criminal acts of violence that would constitute a continuing threat to society?·
>
> Answer: yes.

To decide whether receipt of this evidence was error of constitutional magnitude, we must place it in the context of trial. Only when laid in its precise place in the unique factual mold of this case can we learn its relevance, judge its effect, and pass on the asserted error.

In the sentencing phase the state proved that Autry was convicted in Potter County, Texas of robbery by assault in 1973 and sentenced to five years in the state penitentiary; that he was convicted in 1976 of burglary of a building and sentenced to eight years. The admitted jail records reflected that Autry was placed in the Jefferson County Jail on April 20, 1980, at 2:55 p.m.; that he was "bonded out" at 3:05 p.m. on the same day. No other reference was made to these convictions or to the April 20 jailing except in the state's closing argument on question number two. That argument was:

> Wesley Rivers got up there and talked to you about penitentiary packets. He told you—he said that James David Au-

try upon the testimony of the fingerprint expert and everything was convicted of robbery by assault in Potter County. He was sentenced to the penitentiary March 14, 1973 for five years. That's March of '73.

This shows how our justice system works. On June 14, 1976 he was sentenced again to the penitentiary for burglary of a building. That's about four years later. And he was sentenced for eight years. That's June 14, 1976 he was sentenced for eight years.

On April 20th, the same day that this incident occurred, he was bonded out of jail for auto theft.

That night he committed the offense of capital murder.·

Now, we talked about probabilities on Voir Dire and I asked you what is the probability of this man being a threat to this society. You have to answer that question yes if you follow the law.

The evidence was not used in an effort to prove that Autry committed the extraneous offense. As evidenced by its argument, the state wanted before the jury when it considered the two questions the fact that Autry had been bonded out of jail only hours before he killed two people and seriously injured a third. This emphasis upon use is cardinal. The closing arguments of counsel also make plain that the use made of the accused evidence was not to create an inference that because Autry committed felony theft he had also committed murder, the inference forbidden by the limitations on evidence of extraneous offenses.

Autry points to a number of jurisdictions that condemn proof of extraneous offense in the sentencing phase of capital cases by less than a conviction. *See, e.g., Provence v. State,* 337 So.2d 783 (Fla.1976), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977); *State v. Bartholomew,* 98 Wash.2d 173, 654 P.2d 1170 (Wash.1982); *State v. McCormick,* 397 N.E.2d 276 (Ind.

---

**3.** As noted earlier, if raised by the evidence, the jury must also consider "whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." Tex.Code Crim.Proc. art. 37.071(b)(3). This interrogatory was not submitted to the jury and Autry does not contend that it should have been.

1979). We have no occasion to quarrel here with the decisions because they are inapposite. Unlike the Texas statute, the death penalty statutes of Florida, Washington, and Indiana do not require a determination that the accused would commit criminal acts of violence that would constitute a continuing threat to society. Rather, they require a determination that one or more particularized aggravating circumstances exists, including that the accused has previously committed other crimes or other murders.[4] When the effort is to prove that a defendant committed a particular crime on an earlier occasion, insisting in the capital case that such proof be only by a prior conviction may not be unreasonable.[5] The effort here, however, was not to prove that Autry had committed theft or that he was a thief. Indeed, the jury already had before it two previous convictions for theft-type offenses.

That Autry was only out of jail a few hours before the murders is highly relevant to the inquiry into the probability of future acts. The relevance is not that he was charged with another crime, but that he was so recently freed. His release would have remained relevant regardless of the charge or his innocence. But that this proof was relevant answers only part of the inquiry because much relevant evidence carries the freight of collateral prejudice. It may assist in the answer of a proper question but present the risk that the trier of fact will be otherwise prejudiced. This duality of impact is such standard fare that Fed.R.Evid. 403 may be the most frequently cited of the federal rules of evidence. Something akin to its balancing inquiry is inevitable in gauging the prejudice wing of such otherwise relevant evidence.

Here there was potential risk that the jury might be prejudiced by evidence of Autry's arrest for felony theft if from the fact of the charge it drew the inference that he was guilty of the charge. The possibility that such inferences may be drawn is high enough that we admit such evidence at the guilt stage of a trial only with great care and in limited circumstanc-

---

**4.** All the statutes, of course, authorize consideration of mitigating factors, as they must to pass constitutional muster under the Supreme Court's 1976 death penalty decisions. *See Proffitt v. Florida,* 428 U.S. 242, 257–58, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976).

**5.** We must also emphasize the structure of the Texas death penalty system. Under Texas law, before the inquiries of Tex.Code Crim.Proc. art. 37.071(b) are even submitted to the jury, the jury must find that murder was committed under one of five circumstances, including "in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated rape, or arson." Tex.Penal Code § 19.03(a). Thus, Texas law in effect provides for a determination to be made during the guilt phase that other states reserve for the sentencing phase. As the Supreme Court noted in *Jurek,* "While Texas has not adopted a list of statutory aggravating circumstances the existence of which can justify the imposition of the death penalty as have Georgia and Florida, its action in narrowing the categories of murders for which a death sentence may ever be imposed serves much the same purpose." 428 U.S. at 270, 96 S.Ct. at 2955.

Evidence of the extraneous offense was not introduced here until the sentencing phase. Thus, there can be no possibility that it infected the jury's determination that Autry committed murder under an "aggravating circumstance." The Supreme Court's 1976 decisions require that before the death penalty may be imposed, the sentencing authority must find the presence of at least one statutory aggravating factor, and then must weigh the evidence of mitigating factors adduced by the defendant. *Gregg v. Georgia,* 428 U.S. 153, 206–207, 96 S.Ct. 2909, 2940–2941, 49 L.Ed.2d 859 (1976); *Jurek v. Texas,* 428 U.S. at 276, 96 S.Ct. at 2958. While the admission of evidence of an extraneous offense in the second phase of a Texas bifurcated proceeding must be watched closely and may implicate other constitutional concerns, we point out that it in no way undermines the constitutionally mandated procedures for imposition of a death sentence set forth by the Supreme Court in *Jurek* and the other 1976 decisions. Texas decisions have uniformly approved the admission of extraneous offenses at the sentencing phase. *Rumbaugh v. State,* 629 S.W.2d 747, 754 (Tex.Cr.App.1982); *Williams v. State,* 622 S.W.2d 116, 120 (Tex.Cr.App. 1981), *cert. denied,* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982); *Brooks v. State,* 599 S.W.2d 312, 322 (Tex.Cr.App.1979), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981).

es. That circumscription responds to the common fact pattern where the prejudice is that a jury may conclude that the defendant committed offense A and then conclude that because he was "bad enough" to have committed offense A he also committed offense B. The risked prejudice here is that the jury might conclude from Autry's arrest for felony theft that he was guilty of that offense and then add this "guilt" to its calculus in answering the two death interrogatories. Whether this hypothesized prejudice was realized here is answerable only in its trial context, that is, what the evidence was, and how it was presented and argued to the jury. We return to that scene.

Autry was given free reign in cross-examination and argument to make the obvious point that the arrest for felony theft was no evidence of Autry's guilt of that offense. The state never suggested the contrary. Indeed Autry insinuated, without response from the state, that the charge had been dismissed. Further, the jury already had before it a criminal resume that included two prior felony convictions as well as Autry's most recent conviction for capital murder by the jury assertedly prejudiced. In this context, any prejudice was slight, and was easily outweighed by the probative value of the evidence. To put it simply, Autry's guilt of felony theft and whether he was justifiably jailed for that offense were never at issue and were, in fact, beside the point. The argument was, What does the circumstance that one so recently subjected to the constraints of jail would rob and kill tell you about his ability to conform—the probability of future acts of violence?

In sum, in the context of this trial we find no reversible error in the receipt of this evidence of Autry's jailing and release; certainly it was not "critical." We do not here open wide the door to proof of extraneous offenses at the sentencing hearing. To the

contrary, we also are wary of their use, particularly in a capital case. But evidence must be examined as used. For an appellate court, evidence is not a legal abstraction, but historical fact.

### D.

■ Autry next argues that there is insufficient evidence to support the required jury finding that the murder of the clerk was during an attempt to rob or a robbery. Autry concedes that his statements to his mother provide evidence of an attempted robbery. Autry's argument is that there must be independent evidence, which he refers to as "corpus delicti," of attempted robbery. Such a state rule of "corpus delecti" has no independent constitutional footing. *Llewellyn v. Stynchcombe,* 609 F.2d 194, 196 (5th Cir.1980) (Georgia rule requiring independent corroboration of an accomplice's testimony not controlling upon collateral review by a federal court).[6] Our standard for reviewing sufficiency of evidence claims in collateral attack upon state criminal convictions is that:

> [T]he applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.

*Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–2792, 61 L.Ed.2d 560 (1979).

Autry points out that Broussard's wallet and Drouet's purse both had cash when their bodies were found; that the cash register was off; and that no money was missing from the register. However, Lillian Young, the district manager for Sak-N-Pak, testified that the cash register key is usually in an "off" position only when the clerk is away from the register and that the last purchase, according to the register tape, was for two packs of cigarettes. Mark Sandifer testified that when he drove up to the Sak-N-Pak, his brother was inside the

---

6. Even if it could be argued that due process requires a state to follow its own rules establishing a heavier evidentiary burden, *see Tarpley v. Estelle,* 703 F.2d 157, 162 n. 8 (5th Cir. 1983), we would conclude that the burden was

met here. As noted herein, the circumstances of Autry's entry and reentry into the Sak-N-Pak furnish independent evidence of an attempted robbery.

store and Autry was standing outside the store carrying a sack.

We are persuaded that a rational trier of fact could have concluded that Ms. Drouet was murdered in the course of an attempted robbery. There is no other reasonable hypothesis. Autry's refined dissection of the facts leaves untouched the outline of that raw Sunday night in Texas. Two young, white males carrying pistols entered a convenience store, a prime target for robbery, attended by one female clerk in the middle of the evening. Both fled, leaving the clerk fatally wounded. One, fearing identification, returned to the scene and shot two potential witnesses. Autry's proffered hypothesis—unsupported by any evidence—is the possibility of some type of argument with the clerk. But, what a strange argument that leads to the execution of an unarmed and unaccompanied female, and the later execution and attempted execution of two witnesses who might identify them. It would take an irrational juror so to find. At the very least these facts corroborate and provide proof of an attempted robbery and homicide independent of the explicit statement Autry made to his mother that he entered the store to rob it and couldn't stop shooting.

### E.

Autry's final contention is that the death sentence here contravenes the Eighth and Fourteenth Amendments in that there is insufficient evidence to prove that Autry, and not John Alton Sandifer, killed or attempted to do so. *Enmund v. Florida,* —— U.S. ——, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

Mark Sandifer testified that when his wife Judy left the Sak-N-Pak store that evening, there was no body in the parking lot; that Autry left his car and headed back in the direction of the store carrying a gun. Another witness identified Autry as the man she saw fleeing the scene shortly before she saw the victims, two inside and one outside the store. Mark Sandifer also testified that Autry told him in the late evening of the robbery that he had just "killed some people." Autry gave the chrome-plated .38 to Mark that was later identified by a firearms examiner, John Beene, as the weapon used to kill Drouet. This argument is without merit.

For the reasons stated, and fully sensitive to the consequence of our judgment and our oaths, we affirm the judgment of the United States District Court dismissing Autry's petition for writ of habeas corpus.

AFFIRMED.